THOMPSON, Associate Judge, dissenting:
 

 As the majority opinion recounts, after the Washington Teachers Union President ("WTU") and Executive Board decided to terminate the additional compensation to which appellant Peterson was entitled by virtue of her election as WTU Vice-President ($50,000 per year during a three-year term, supplementing the salary she earned as a classroom teacher), appellant filed a demand for arbitration, seeking to recover her withheld compensation. The arbitrator awarded her $71,065.82, the amount she had been denied in additional compensation through the date of the evidentiary arbitration hearing. Peterson thereafter initiated the instant litigation to recover the additional compensation she claimed was due to her from that point until the end-date of her three-year term. The trial court dismissed her claim on the basis of the
 
 res judicata
 
 effect of the confirmed arbitration award. Agreeing with the trial court's application of the doctrine of
 
 res judicata
 
 , my colleagues in the majority reason that "the compensation claim stemming from [WTU's] breach of contract was adjudicated finally in the [action confirming the arbitration], ... which has a preclusive effect on future litigation stemming from the same claim and involving the same parties."
 
 Ante
 
 , at 575. I disagree and therefore respectfully dissent.
 

 To help explain why I am unable to agree with my colleagues' resolution of this appeal, I think it will be helpful to quote at some length from the arbitrator's decision:
 

 This brings us to the central issue in this case: whether the revocation of Peterson's compensation by Saunders and the Executive Board violated the Compensation Agreement. As noted, the Compensation Agreement states that Peterson's compensation should continue during Peterson's three[-]year term as General Vice President. The key words in the Compensation Agreement are that Peterson's salary and the other terms of her compensation "shall remain in full affect." Significantly, the Compensation Agreement vests no authority in the WTU's President or its Executive Board to cease paying this compensation. The Compensation Agreement likewise provides no grounds for revoking, terminating or refusing to pay Peterson's salary. It appears from the terms in the Compensation Agreement that the WTU's obligation to pay Peterson her compensation for service as the General Vice President was unconditional.
 

 The Compensation Agreement, however, must be read and understood in the context of the WTU's Constitution and By-Laws [which the Compensation Agreement incorporates by reference].
 

 ...
 

 The only means set forth in the Constitution and By-Laws for removing Peterson from her elected position as General Vice President and ending her compensation was through Recall. Peterson was placed in office by the vote of the WTU's membership, and any decision to terminate her was in the words of the Constitution "the right" of the members. The WTU did not follow this path. It is undisputed that no Recall petition was ever filed against Peterson by the Executive Board, or by [WTU President] Saunders or by any other union member.
 

 When on July 26, 2011, Saunders summarily removed Peterson from the WTU payroll "for failure to perform the duties association with [her] position," he acted as though he had the czar-like power to do this. He did not. The Constitution and By-Laws vested no authority in the President to remove the elected General Vice President from the WTU payroll and to stop her from performing the duties that were assigned to her by the Union's Constitution and By-[L]aws. Although the President, as indicated in Article VIII of the By-Laws, had the authority to supervise the WTU's "employees," that authority did not authorize the President to cancel the pay and truncate the authority and responsibility of another elected official. Significantly, the action taken by Saunders against Peterson was not based on Peterson's status as an employee but as the elected General Vice President. It was Peterson's authority and salary as the second highest ranking, elected union officer that was under direct attack, not her status as an employee.
 

 ...
 

 Assuming
 
 arguendo
 
 that the Executive Board had the authority to cease paying Peterson's salary and to terminate her supervisory authority, the manner in which the Executive Board exercised such authority abridged both the letter and the spirit of the WTU Constitution and By-Laws.... Saunders and the Executive Board rushed to judgment without hearing a word from Peterson, acting as if its primary goal was to cut her pay, cut her authority and as a practical matter railroad her out of office.... Peterson was entitled to a hearing and the other elements of due process contemplated by the WTU's Constitution and By-Laws.
 

 ...
 

 Saunders was [earlier] on record as subscribing to the belief that, "the only remedy available to deal with situations when the General Vice President is not performing his duties is to go through the recall process set forth in the WTU Constitution and By-Laws."
 

 ...
 

 In summary, neither the letter nor the spirit of the WTU's Constitution and By-Laws permitted Saunders or the WTU's Executive Board to summarily revoke, without a hearing or due process, the compensation that Peterson was entitled to receive under the terms of the Compensation Agreement. Peterson was not a rank and file employee who served at the will or pleasure of union officials. She was an
 
 elected
 
 official who, under the terms of the Constitution, had a fixed, three-year term of office and who was entitled to compensation for her service throughout her term.
 

 The arbitrator also wrote this footnote:
 

 The undersigned arbitrator offers no opinion regarding the merits of the allegations made against Peterson by Saunders in his letter dated July 26, 2011[,]
 

 or regarding the merits of the charges made against Peterson by the Executive Board in its Resolution dated August 4, 2011. Nor does the arbitrator express any opinion regarding whether Peterson was satisfactorily performing her duties as General Vice President or whether she could or should have been recalled under the terms of the Constitution and By-Laws. This Opinion and Award is addressed to and resolves the basic issue in this arbitration of whether the WTU's President and its Executive Board, acting on behalf of the WTU, breached the contractual terms of the Compensation Agreement by terminating Peterson's compensation.
 

 As can be discerned from the arbitrator's decision, the agreement between appellant and WTU was neither at-will employment at the pleasure of the WTU Executive Board and President, nor the run-of-the-mill employment contract which the employer was free to rescind for cause based solely on her or his own business judgment. As the arbitrator recognized, appellant's entitlement to continue to serve as WTU Vice-President and to receive the additional compensation in issue were the fruits of a vote of the WTU membership and could be terminated only through a membership recall election. So, when the arbitrator concluded that appellant was entitled to $71,065.82 in additional compensation through the close-of-evidence date at the arbitration hearing, he had as a basis for the award the fact that the membership had not petitioned or voted to recall appellant as Vice-President
 
 [7]
 
 (and, as the arbitrator observed in his "[a]ssuming
 
 arguendo
 
 " paragraph, the additional fact that appellant had not been afforded the due process that the WTU Constitution and By-Laws required before she could be constructively discharged form her position).
 

 Not knowing whether a recall election would be held (or a due-process hearing afforded) before the end of appellant's term, the arbitrator had no basis for determining that appellant was entitled to additional compensation through the end of the three-year term to which she was elected.
 
 [8]
 
 The situation was quite different from cases in which the fact and amount of front-pay damages can reasonably be ascertained because it is clear (or can be fairly inferred) that the employer, who is the sole decision-maker, has no intention of allowing the employee to return.
 
 [9]
 
 Indeed, in light of the arbitrator's finding that the WTU President and Executive Board had no authority to suspend appellant's compensation, a reasonable observer would likely have expected that appellant would be reinstated and paid the additional compensation attendant to her office as until such time as a recall election was held.
 

 Given all the foregoing, I believe that the doctrine of
 
 res judicata
 
 does not apply so as to bar appellant's claim. "Under the doctrine of res judicata ... a judgment estops not only as to every ground of
 recovery or defense actually presented in the action, but also as to every ground which might have been presented[.]"
 
 Henderson v. Snider Bros.
 
 ,
 
 439 A.2d 481
 
 , 485 (D.C. 1981) (internal quotation marks omitted) (en banc). The doctrine applies "[w]hen the parties are the same, and the essence of the claim and the evidence necessary to establish it are the same."
 

 Id.
 

 at 484
 
 . "In determining whether
 
 res judicata
 
 applies, we consider (1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case."
 
 Calomiris v. Calomiris
 
 ,
 
 3 A.3d 1186
 
 , 1190 (D.C. 2010) (internal quotation marks and alterations omitted).
 

 Here, "the evidence necessary to establish [appellant's claim]" is
 
 not
 
 the same as it was with respect to the claim that was before the arbitrator.
 
 Henderson
 
 ,
 
 439 A.2d at 484
 
 . In the arbitration proceeding, for appellant to prevail, the evidence had to show (as it did) that no recall election had happened as of the date the record closed, i.e., August 30, 2012. In the instant case, for appellant to prevail, the evidence must establish that she also was not recalled at any time after that date and before the end of her term (apparently, November 30, 2013). Further, because appellant's entitlement to continue as WTU Vice-President and to earn additional compensation through November 30, 2013, depended on what the WTU membership did after the arbitration hearing, appellant's claim could not have been and "was [not] adjudicated finally in the first action."
 
 Calomiris
 
 ,
 
 3 A.3d at 1190
 
 . A claim that appellant was owed additional compensation for the period from August 30, 2012, through November 30, 2013, because no recall election occurred before the latter date was not a "ground which might have been presented" during the arbitration proceeding.
 
 Henderson
 
 ,
 
 439 A.2d at 485
 
 (internal quotation marks omitted). Rather, this is a case in which "additional facts emerged after the conclusion of the [arbitration] which gave rise to additional claims."
 
 Utah Republican Party v. Cox
 
 ,
 
 177 F.Supp.3d 1343
 
 , 1361 (D. Utah 2016).
 

 For all the foregoing reasons, I would hold that appellant's claim is not barred by
 
 res judicata
 
 .
 
 [10]
 

 The arbitrator noted that "[e]lected officers, like Peterson, ... can only be removed or in other words recalled by a petition signed by thirty percent of the membership" and that it "is undisputed that no Recall petition was ever filed."
 

 As Peterson puts it in her brief, the arbitrator "had no way of knowing whether the WTU would later allow Peterson to resume her duties with pay, after he had rendered his decision." And as the arbitrator himself put it, he could not say whether Peterson "could or should have been recalled under the terms of the [WTU] Constitution and By-Laws."
 

 Keller v. Marvins Credit, Inc.
 
 ,
 
 147 A.2d 872
 
 (D.C. 1959), discussed in the majority opinion, appears to be such a case. Keller was told by the employer that "his services were no longer desired."
 

 Id.
 

 at 873
 
 .
 

 I also think the majority opinion gives short shrift to the contract provision that appellant argues allowed her to split her claims.
 
 See
 

 Gilles v. Ware
 
 ,
 
 615 A.2d 533
 
 , 550-51 (D.C. 1992) (recognizing that an acquiescence to claim-splitting can overcome a
 
 res judicata
 
 defense). The relevant provision is ¶ 12 of appellant's Compensation Agreement with the WTU, which provided:
 

 Non-payment of compensation will accrue as a WTU liability and is not waived. Non-payment of compensation shall create a priority wage lien due in full at the end of [appellant's] term.
 

 My colleagues read this language as merely allowing appellant "to defer an action until the end of her term,"
 
 ante
 
 , at 577, i.e., to wait until the end of her elected term before initiating any action to recover the compensation owed. But the second sentence refers to creation of a lien at the end of appellant's term. Generally speaking, "[a] lien affords a supplemental and additional remedy."
 
 Landis Machine Co. v. Omaha Merchs. Transfer Co.
 
 ,
 
 142 Neb. 389
 
 ,
 
 9 N.W.2d 198
 
 , 203 (1943) (observing also that "a lien is regarded as remedial and must be so construed as to give full force and effect to the remedy");
 
 see also, e.g.
 
 , 53 Am. Jur. 2d
 
 Mechanics' Liens
 
 § 322 ("[T]he remedy upon a construction lien and the remedy upon the debt are distinct and concurrent and may be pursued at the same time or in succession."). I am inclined to read ¶ 12 as affording appellant a supplemental opportunity, after the end of her elected term, to recover the compensation due to her, notwithstanding the arbitration award she obtained mid-term.